**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **CHARLES T. BOWEN and** | ) | **Case No.   04-21522-TLM** |
| **LORI M. BOWEN,** | ) | |
| | ) | |
| **Debtors.** | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| _____ | ) | |

**INTRODUCTION**

Charles Todd Bowen and Lori Bowen ("Debtors") filed a voluntary petition for chapter 13 relief on October 12, 2004, commencing this case. Their attempts to confirm a chapter 13 plan are opposed by the Internal Revenue Service ("IRS"), their largest creditor.

On August 16, 2005, a hearing was held concerning confirmation of Debtors' First Amended Chapter 13 Plan, Doc. No. 33 ("Plan"). The IRS' objection to confirmation, by the time of that hearing, had been reduced to the question of whether Debtors' Plan had been "proposed in good faith" as required by § 1325(a)(3). This issue was taken under advisement on August 31 upon completion of post-hearing briefing.

MEMORANDUM OF DECISION - 1

**STANDARDS**

To be confirmed, a chapter 13 debtor's plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S. Code § 1325(a)(3). The Court evaluates good faith under the "totality of the circumstances." *In re Hult*, 04.1 I.B.C.R. 18, 20 (Bankr. D. Idaho 2004) (citing *In re Villanueva*, 274 B.R. 836, 841 (9th Cir. BAP 2002)).[1] This Court, in *In re Johnson*, 262 B.R. 831, 01.2 I.B.C.R. 72 (Bankr. D. Idaho 2001), listed several factors that may be relevant to a finding of good faith:

1)  The amount of the proposed payments and the amounts of the debtor's surplus;
2)  The debtor's employment history, ability to earn, and likelihood of future increases in income;
3)  The probable or expected duration of the plan;
4)  The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;
5)  The extent of preferential treatment between classes of creditors;
6)  The extent to which secured claims are modified;

---

[1]  *Villanueva* cited *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386 (9th Cir. 1982), a seminal case on the standard of good faith. *Goeb* stated:

Given the nature of bankruptcy courts and the absence of congressional intent to specifically define "good faith," we believe that the proper inquiry is whether the [debtors] acted equitably in proposing their Chapter 13 plan. A bankruptcy court must inquire whether the debtor has misrepresented facts in his plan, unfairly manipulated the Bankruptcy Code, or otherwise proposed his Chapter 13 plan in an inequitable manner. Though it may consider the substantiality of the proposed repayment, the court must make its good faith determination in the light of all militating factors.

*Id.* at 1390.

MEMORANDUM OF DECISION - 2

7)    The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8)    The existence of special circumstances such as inordinate medical expenses;

9)    The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10)   The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11)   The burden which the plan's administration would place upon the trustee.

262 B.R. at 839.  As *Johnson* notes, this list is "non-exhaustive."  *Id.*  Obviously, some of the listed factors might not be particularly important in a given case, while factors not listed might be quite important.  Most courts would agree that

> [a]ny inquiry into a debtor's good faith or bad faith will necessarily be very fact driven.  A court must apply broad standards and general definitions of bad faith to the specific facts of the case to determine if there is fraud, deception, dishonesty, lack of disclosure of financial acts or an abuse of the provisions, purpose or spirit of the Bankruptcy Code.  In other words, a court will have to determine if there has been an unfair manipulation of the bankruptcy system to the substantial detriment or disadvantage of creditors.

*In re Siegfried*, 219 B.R. 581, 585 (Bankr. D. Colo. 1998).

## FACTS

Debtors filed a prior chapter 13 bankruptcy, Case No. 03-21682, in October, 2003.[2]  Determining that they lacked eligibility for chapter 13 relief given the amount of their debt, *see* § 109(e), Debtors converted that case to a chapter 7.  After receiving a discharge in that case, but before that case was fully

---

[2]  At hearing, the Court granted a request for judicial notice of Debtors' various filings in the two cases.  *See* Fed. R. Evid. 201; *see also* Fed. R. Evid. 801(d).

MEMORANDUM OF DECISION - 3

administered or closed, Debtors filed the present chapter 13, Case No.

04-21522-TLM.[3]

### A.    Tax claims

In their initial schedules in the present case, Debtors indicated that the IRS

held a secured claim ($43,717.00), an unsecured priority claim ($74,482.37) and a

general, nonpriority unsecured claim ($114,328.00).  Ex. 103.  The Idaho State

Tax Commission ("ISTC") is shown on Debtors' schedules as holding an

unsecured priority claim ($22,863.00) and a general, nonpriority unsecured claim

($56,789.00).  *Id.*  While there are a few other secured creditors, there are no other

scheduled unsecured creditors, priority or nonpriority, in this case.  *Id.*[4]

The IRS filed a proof of claim indicating that the secured portion of its

claim was approximately $120,000.00 and the nonpriority unsecured portion was

roughly $84,500.00.  (The IRS' priority unsecured claim was asserted in an

---

[3]  The 2003 chapter 13 case was converted to chapter 7 on May 14, 2004.  Discharge was
entered September 1, 2004.  Debtors sought turnover of certain funds, derived from plan
payments in the chapter 13 case, from the chapter 7 trustee.  This was resisted by the trustee, who
contended that the funds should be treated as property of the chapter 7 estate under § 348(f)(2).
The 2004 chapter 13 case was filed on October 12, 2004, with the turnover issue at that time
being unresolved.  Debtors later withdrew that motion, though their plan contemplates these
funds will be paid over to the chapter 13 trustee.  The chapter 7 trustee continues with his
administration of the 2003 case and estate.

[4]  However, proofs of claim have been filed by creditors, other than the IRS and the
ISTC, asserting unsecured claims totaling $8,143.52.  *See* Claim Nos. 4, 5, 6 and 11.  Debtors
have filed objection to these claims arguing that they were discharged in the chapter 7 case.  *See*
Doc. Nos. 17, 18, 25, 26, 27.  Debtors withdrew their objection to a $376.83 claim (*see* Doc. No.
32); a creditor withdrew one of the claims (*see* Doc. No. 24).  Orders were never entered as to the
other two claims, and Debtors renewed their objections.  *See* Doc. No. 66, 67.

MEMORANDUM OF DECISION - 4

amount consistent with Debtors' schedules.)  Debtors objected to this claim,
contending that the secured claim should be about $79,500.00 and the unsecured
claim should be about $125,000.00.  At a July 13 hearing, the Court was advised
that matter was settled and that the IRS would file an amended proof of claim
showing the approximate amounts of $80,000 (secured) and $120,000
(unsecured).[5]

On August 1, the last amended claim of the ISTC was filed.  It is owed a
priority unsecured debt of $32,026.45 and a nonpriority unsecured debt of
$55,980.46.  *See* Claim No. 14.  The IRS' amended claim of August 12 establishes
a secured claim of $79,457.00, a priority unsecured claim of $74,482.37, and a
nonpriority unsecured claim of $125,089.19.  *See* Claim No. 15.

The genesis of these obligations to the IRS was established by the exhibits
and Mr. Bowen's testimony.[6]

The tax debts arose between 1997 and 2002 when Mr. Bowen, an airline
pilot with a substantial income, filed W-4 withholding forms claiming to be
"exempt" from income tax.  Thus, no withholdings were made.  Simultaneously,

---

[5]  Similarly, Debtors objected to the ISTC's proof of claim.  The Court was told at the
July hearing that it, too, had been resolved and an amended claim would be filed.  The ISTC's
objection to confirmation was withdrawn as part of this settlement.  *See* Doc. No. 63.  The ISTC
did not participate in the August 16 hearing.

[6]  The Court closely observed Mr. Bowen during his testimony and evaluated his
credibility in light of all the facts.  The Court found Mr. Bowen generally credible, though he
obviously harbors resentment toward the IRS and was on some occasions argumentative with
counsel for the IRS and unresponsive to its questioning.

MEMORANDUM OF DECISION - 5

Debtors failed to timely file tax returns.

Returns for 1997 through 1999 were ultimately filed in October, 2002.  Ex. 107.[7]  Mr. Bowen attached a letter to these returns which argued that there was no obligation to file returns or pay taxes, protested the IRS procedures and conduct in assessing and attempting to collect these taxes, and indicated that the returns were made only due to the IRS' liens and threat of levy and the potential hardship to his family.  *Id.*  Mr. Bowen now admits, though grudgingly, that the "legal" analysis he followed in claiming to be "exempt" and failing to pay taxes was flawed.

Debtors assert that the first bankruptcy, in October 2003, was compelled by collection efforts of the taxing authorities, including the IRS' requirements for "over-withholding" that reduced his take-home pay, and the ISTC's levies and garnishments that took, or threatened to take, all of Mr. Bowen's net paychecks.

While that chapter 13 case was pending, Debtors' returns for 2000 through 2002 were filed.  Ex. 108.[8]  Another $68,026.00 in federal tax debt was added to what already existed.

_____

[7]  The status of Mr. Bowen's 1997 and 1998 returns was "married, filing separately" and, for the 1999 return, was "single."  The total unpaid liability for the three years is shown as $82,640.31.  Withholdings of $5,891.00 from his airline employer are shown in the 1997 return, and no other withholdings or payments are otherwise shown.

[8]  All these returns were signed by Debtors on December 10, 2003, and the filing status of each was "married, filing jointly."  No withholdings or payments are reflected on any of these returns.  The 2000 return showed a liability of $24,398.00.  The 2001 return showed a liability of $22,758.00.  The 2002 return stated a liability of $20,870.00.

MEMORANDUM OF DECISION - 6

### B.    Conversion, and post-conversion events

Debtors came to realize that their tax liabilities were so large that, when combined with their other unsecured debt, Debtors exceeded the eligibility limits for chapter 13 relief.  Debtors therefore converted the chapter 13 case to a chapter 7 liquidation.

No payments had been made to creditors secured by motor vehicles during the chapter 13 process.  Facing stay lift and repossession of their truck and SUV, Debtors borrowed $12,000.00 from Mrs. Bowen's stepfather to bring the obligations current, then borrowed against Mr. Bowen's 401(k) account to repay her stepfather.[9]

Debtors initially showed no 401(k) interest on the 2003 schedules.  Ex. 101.  However, amendments to the schedules showed almost $185,000.00 in such an account.  Ex. 102.  By the time of the 2004 filing, the 401(k) account had increased to $209,000.00.  Ex. 103.  Debtors claim that the $24,000.00 of growth is a result of loan payments, continued employer contributions (of approximately $20,000.00 by Mr. Bowen's estimate) and interest.  Mr. Bowen claims that no voluntary contributions were made.

---

[9]  Obligations to "Fidelity" secured by the 401(k) are shown in the schedules, and some reference is made in Debtors' response to question 3 on their statement of financial affairs to the creditor payments and the loan from the relative that was repaid.  *See* Ex. 103, Ex. 106.

MEMORANDUM OF DECISION - 7

### C.    Debtors' Idaho property, and the Wyoming residence

The 2003 schedules indicated Debtors owned real property in Pollock, Idaho, a town about 150 miles north of Boise.  Ex. 101.  Testimony established that Mrs. Bowen and Debtors' children live at that residence.

The amended schedules in the 2003 case changed the disclosure of real property to "none."  Ex. 102.  This reflected Debtors' conclusion that the property had been effectively transferred prepetition into a family trust (the "Bentstik Ranch Trust") and was not owned by them.[10]  Mr. Bowen indicated that he and Debtors' attorney had several discussions on the subject, and had disagreed on whether Debtors were or would be found to be the owners.  Debtors concede their ownership in the present case, and once again schedule the real property.  Ex. 103.[11]

The 2003 petition showed the address of both Debtors as the Pollock property.  The 2004 petition showed Mrs. Bowen located there, but asserted a

---

[10]  However, the amendment did not eliminate the schedule D secured claim of the mortgagee, Cendant Mortgage, though the description of the security for the claim was modified to reflect Debtors' assertion that the home was owned by the trust.  *Id.*

[11]  The IRS contends that the decision to concede the ownership of the real property is not motivated by Debtors' changed view on the factual and legal arguments surrounding the family trust and earlier transfers.  Rather, the IRS argues, Debtors came to realize that admitting ownership would allow a portion of the IRS' claim to be treated as secured and that, without that change, the unsecured debts would exceed the chapter 13 eligibility limit of $290,525.00 under § 109(e).  So, the IRS argues, Debtors' concession meant reduced litigation on the characterization of the asset and an ability to stay in chapter 13, more than offsetting the downside of paying the secured claim with interest under the Plan.

MEMORANDUM OF DECISION - 8

street address for Mr. Bowen of 11 Stassinos Ranch Road, Rock Springs,

Wyoming.  Mr. Bowen explained that he and his wife had separated in 2002, and

the Wyoming property is a mobile home owned by a friend, who allows him to

stay rent-free.  Mr. Bowen stated that he stays at the Rock Springs address when

he is not flying for the airline, or visiting his children in Pollock, and that he

changed his mail delivery to Rock Springs in early 2003.[12]  Mr. Bowen indicated

that Debtors remain separated at the present time, but have not divorced.  Though

they have made efforts to reconcile, they have not yet done so.

In response to questioning, Mr. Bowen explained that his job as a

commercial pilot requires him to travel to Phoenix, where his scheduled flights

originate.  When working, he stays in hotels at various cities depending on his

flight schedule.  When off work, which amounts to only 8 to 10 nights per month,

he stays either in Rock Springs or, if possible, visits his children in Pollock.  If in

Wyoming, he has to drive to Salt Lake City, Utah, some 180 miles, in order to fly

to Phoenix where he commences his scheduled flights.  If in Pollock, he has to

return 150 miles to Boise in order to fly to Phoenix.

### D.    The budget

Debtors' schedule I and two schedules J, *see* Ex. 103, make the following

---

[12]  The schedules in neither case reflect any leases, nor do any of the statements of financial affairs reflect a change of address.  As noted, the 2003 petition showed both Debtors' address as Pollock, notwithstanding testimony about the 2002 separation.

MEMORANDUM OF DECISION - 9

assertions.

Mr. Bowen's gross income is $10,100.00 per month. Mrs. Bowen is unemployed. Mr. Bowen's gross income is reduced by payroll deductions for 401(k) loan repayments of $842.00 per month (a subject that will be addressed further below). When added to payroll deductions for insurance and union dues, his net income is $7,743.00 per month.

Mr. Bowen shows no rent or mortgage expense on the first (and apparently "his") schedule J. He claims a food expense of $150.00 per month, a number of smaller miscellaneous expenses, a $75.00 per month "transportation" expense, an installment payment on one of the vehicles of $538.00, and $500.00 per month for support. This last is in regard to Mr. Bowen's first marriage, and he indicates this child support obligation will conclude in February, 2006. "His" expenses total $1,535.00 per month.

The second schedule J, for Mrs. Bowen, shows mortgage expense of $1,234.00, a food budget of $500.00 for her and the children, slightly higher living and miscellaneous expenses than for Mr. Bowen, a $150.00 per month transportation expense, and the installment obligation on the other vehicle of $731.00 per month.[13] This schedule totals $3,408.00 per month. Together, the

---

[13] Mr. Bowen's vehicle is a 1999 Dodge Ram 2500. Schedule B indicates an $18,000.00 value, and schedule D reflects a $17,000.00 debt. The Plan proposes that the claim secured by the Dodge will be paid directly by Debtors ("outside the plan" in the practitioners' less than

(continued...)

MEMORANDUM OF DECISION - 10

expenses of $4,943.00 leave $2,800.00 of Mr. Bowen's monthly net income

available for plan payments.

### E.    The Plan

The Plan as filed proposes payments of $2,800.00 (for 4 months),

$2,533.00 (12 months)[14] and $2,800.00 (43 months), for 59 months of payments

totaling $161,996.00.  The Plan also proposes special payments of $9,588.00 from

the funds held by the chapter 7 trustee, and of $50,000.00 by Debtors at the end of

the Plan term from a loan they would take from their 401(k).  *Id.*  A total of

$221,584.00 is thus proposed.[15]

Debtors' analysis after the Plan was filed indicated that the support

obligation's termination in February, 2006, would allow for an increase in

monthly payments to the trustee of $500.00 after that date.  Thus, Debtors now

assert that the payments for the final 40 months will be at $3,300.00 each rather

---

[13](...continued)
accurate vernacular), and the amount of the installment is indicated in the first schedule J.  Mrs.
Bowen's vehicle is a 2001 GMC Yukon, valued at $22,000.00 on schedule B with a debt of
$20,860.00 per schedule D.  The installment on the GMC is $731.00 and is also to be paid
directly by Debtors.

[14]  The reason for this reduced payment is not clear and will be discussed further in the
text.

[15]  The Plan also commits any future tax refunds.  Under the circumstances of this case,
the possibility of tax refunds which will be received and could be paid over to the trustee for
distribution under the Plan appears rather remote.  However, Mrs. Bowen did testify that she had
filed an amended return related to 2003, and it generated a refund of $3,195.00.  She indicated
this amount would be turned over to the trustee as additional Plan payment.

MEMORANDUM OF DECISION - 11

than $2,800.00.  *See* Doc. No. 69 (post-hearing brief) at 8.  With this additional

$20,000.00 (*i.e.*, 40 x $500.00), the total paid into the plan would be $241,584.00.

With the 2003 refund of $3,195.00 added, *see* note 15, the total Plan funding

would be $244,779.00.

Other than trustee's fees[16] and whatever compensation is allowed to

Debtors' counsel,[17] virtually all the funds will be disbursed to the IRS and the

ISTC.  *Id.* at 8-9.  Debtors project that all priority unsecured claims will be fully

paid, and the IRS secured claim paid with interest.  *Id.*  Debtors' numbers indicate

a distribution of $8,751.00 (roughly 5%) on the general unsecured claims of the

IRS and the ISTC.  *Id.*[18]

Debtors' Plan and budget contemplate that loan payments on loans

previously taken by Debtors from their 401(k) will be paid during the life of the

---

[16]  At 10% of Plan payments as summarized in the text, the fee would be $24,477.90.

[17]  No fee application has yet been filed.  Debtors' counsel estimates $10,000.00 in the
post-hearing brief.  *See* Doc. No. 69 at 9.

[18]  Debtors' brief fails to include the $3,195.00 discussed at hearing.  If the total Plan
payments are $244,779.00 as discussed in the text, and if the trustee's fee and counsel's fees are
assumed at $24,477.90 and $10,000.00 respectively, the funds left available for payment to
creditors would be $210,301.10.  The priority unsecured claims under the IRS and ISTC amended
proofs of claim total $106,508.82, leaving $103,792.28.  The secured claim of the IRS is expected
to require, with interest, $92,167.00, according to Debtors.  *See* Doc. No. 69 at 8.  (The Court's
amortization calculation is almost identical, and the monthly payment would be approximately
$1,536.00 over the 60 month Plan term.)  This leaves $11,625.28 resulting in a 6% distribution on
the nonpriority unsecured claims as shown on the claim docket.

MEMORANDUM OF DECISION - 12

plan.[19]  Debtors contend that a failure to make such payments will cause the loans

to be treated as distributions and expose Debtors to tax liabilities of roughly

$19,000.00 which they would be unable to pay while performing a plan.  Debtors

propose to account for the negative impact on Plan creditors that flows from their

continued funding of their 401(k) loans by borrowing $50,000.00 from the 401(k)

toward the end of the Plan term and paying that amount to the trustee for

distribution.

**DISCUSSION AND DISPOSITION**

Both the IRS and Debtors have made credible points and arguments in

support of their respective positions on the question of good faith.  The Court has

considered them carefully, and in that evaluation concludes that further

submissions are needed from Debtors before the Court can make its final

determination on the good faith issue.

**A.    Pre-petition acts**

The IRS correctly observes that the tax issues which permeate this case

were the result of intentional acts, including Mr. Bowen's filing the W-4 forms

claiming total exemption from withholding requirements and the failure to timely

---

[19]  The schedules show a total of $38,000.00 was borrowed from the 401(k).  Only
$12,000.00 of this amount was used for repayment of the relative's loan to save the vehicles from
repossession.  The 401(k) loan repayments total $842.00 per month, as reflected by testimony and
by schedule I.  The duration of the payments until the loans are fully paid is not clear.  However,
the original chapter 13 plan indicated that 28 months into the plan, one loan would be paid and an
additional $268.00 would be available for plan payments.  *See* Doc. No. 10.

MEMORANDUM OF DECISION - 13

file returns.  It took not just time but the increasing pressure of collection activities

by the IRS and the ISTC before Debtors filed returns and began the process of

addressing their tax liabilities.

However, chapter 13 provides a means to repay debts, even where certain

of those debts would otherwise be nondischargeable or where the repayment plan

must be imposed over the objection of creditors.  Debtors here simply utilize a

mechanism made available to citizens under the Bankruptcy Code.  The Court

must consider the good faith of Debtors in their Plan now proposed to deal with

their debts, not just their lack of good faith in incurring the debt.[20]

### B.    Serial filings

The IRS observes, again correctly, that Debtors filed a chapter 13,

converted that case when eligibility issues arose, and then filed another chapter 13

even while their chapter 7 case was being administered.  Certainly the frequency

of recourse to bankruptcy protection is a factor that should be considered.

At the same time, the Supreme Court has recognized that serial filings,

including the so-called "chapter 20" (chapter 7 followed by chapter 13), are not

*per se* improper.  *Johnson v. Home State Bank*, 501 U.S. 78, 87 (1991).  *See also*

---

[20]  And, as to the question of the existence or absence of good faith in the incurring of
debt, the Court must note that virtually all the evidence regarding the claiming of W-4
exemptions, the dispute over the need to file returns or pay taxes, the treatment of the trust related
to the Pollock property, the 401(k) transactions, and other matters revolved around *Mr.* Bowen,
not *Mrs.* Bowen.

MEMORANDUM OF DECISION - 14

*Grimes v. Farmers Home Admin. (In re Grimes)*, 117 B.R. 531 (9th Cir. BAP

1990); *In re Covino*, 245 B.R. 162, 168, 00.1 I.B.C.R. 9, 12 (Bankr. D. Idaho

2000).  It is evident that Debtors stood no chance of addressing their sizeable and

nondischargeable tax obligations without first addressing other debt.  That they

chose to seek a chapter 7 discharge and then file the chapter 13 case is not an

absolute bar to confirmation under the good faith standard.[21]

### C.    Other factors and Debtors proposed plan

The Court also acknowledges concerns raised by the IRS in regard to

Debtors' varying treatment of the Pollock property as property of the estate; the

initial failure to disclose the sizeable 401(k) account; the growth of the 401(k) in

the hiatus between the 2003 and 2004 filings that was unexplained until hearing;

and the curing of vehicle loan defaults through personal loans while the chapter 7

was pending and then, before filing the current chapter 13, repaying the relative

with a 401(k) loan, again transactions not well explained in the schedules and

statement.

But in evaluating what Debtors did, the Court must also consider what

Debtors propose to do.  Under the terms of the filed Plan, and the comments of

---

[21]  When Debtors became aware of the eligibility issue, they could have converted their
case to a chapter 11 reorganization.  Because confirmation standards differ between chapters 11
and 13, perhaps the IRS would have preferred that course.  However, the Code and case law gave
Debtors the option to convert to chapter 7 and then file a subsequent chapter 13.  The fact that
they chose this available option does not preclude a finding of good faith, though it is a factor to
be weighed.

MEMORANDUM OF DECISION - 15

Debtors and their counsel at hearing as to changes to be made to that Plan through a confirmation order, Debtors will at least pay $244,779.00. They have proposed a Plan extending the maximum term allowed under the Code. The Plan will fund payment of priority tax debts exceeding $106,500.00, and a secured claim to the IRS that, with interest, Debtors calculate at slightly over $92,000.00. Debtors also will (on projections using the $244,779.00 figure, some assumptions on fees, and the proofs of claims of record) pay about 6% on nonpriority unsecured claims.

While one might hope for a higher distribution, and while as the IRS notes over $100,000.00 of its nonpriority unsecured tax claim will not be paid, the resources of Debtors must be considered. If disposable income is appropriately contributed (and unless the Court finds a lack of good faith), the Code tolerates that result.[22]

Unfortunately, the Court cannot conclude on this record that all Debtors' anticipated, available income is being contributed.

### 1.    401(k) issues

Debtors original plan, Doc. No. 10, proposed continuous $2,800.00 monthly payments that increased to $3,068.00 after 28 months when one of the

---

[22] No § 1325(a) issues were presented other than good faith under § 1325(a)(3). The Court views the IRS' objection and the trustee's preliminary recommendation as implicitly raising § 1325(b) issues. In any event, the context of the good faith inquiry in this case requires the Court to evaluate Debtors' proposed payments in light of their ability to pay, and to do so throughout the Plan term.

MEMORANDUM OF DECISION - 16

401(k) loans was paid.  The Plan, as modified, fails to increase monthly payments after the 28th month when this 401(k) is presumptively paid.  No explanation for the changed approach is provided.

Debtors also fail to identify when the second 401(k) loan will be paid in full.  If that occurs during the Plan term, a concomitant increase in monthly Plan payments would appear appropriate.

The Court appreciates that Debtors' proposed Plan includes repayment of their 401(k) loans.  As the IRS correctly notes, this is generally not allowed under current law.  *See In re Estes*, 00.4 I.B.C.R. 187, 187-89 (Bankr. D. Idaho 2000); *see also In re Braman*, 03.2 I.B.C.R. 102, 103 (Bankr. D. Idaho 2003).[23] However, they have explained their evaluation of the tax ramifications of alternative approaches and, more importantly, they have proposed a "cure" for the negative impact creditors would otherwise suffer – a lump sum payment of $50,000.00 to the Plan from a future loan they will take from that same 401(k).  They have indicated their understanding that they will not be entitled to a discharge until all Plan payments, including this lump sum, are made, and agree that any order of confirmation shall so reflect.  Thus Debtors have provided a rationale for continuing to make the 401(k) loan payments and have proposed a

---

[23] While the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005), has several provisions that relate to treatment of loans from pension plans and 401(k) accounts, those provisions are not applicable to the present case, only those filed after October 17, 2005.

MEMORANDUM OF DECISION - 17

plan methodology that allegedly dispels the negative impact through payment of
the $50,000.00 at the end of the Plan.[24]

Nevertheless, Debtors have not explained why the present Plan differs from
the first proposal, *i.e.*, the absence of increases in plan payments when the second
loan is fully satisfied.  Nor have they shown that the lump sum payment is
sufficient accommodation of the impact of 401(k) loan servicing.  The Court will
require answers to these questions, and greater supplementation of the record,
before entertaining confirmation.

### 2.      Decrease in payment

The Plan, as modified, provides for a $267.00 decrease in the $2,800.00
monthly payments over the 5th through 16th months.  There was no clear
explanation as to this change from the original plan proposal, justifying the
reduction in payment.  Additional information is also required on this issue before
the Court will be prepared to conclude the good faith analysis and consider
confirmation.

### 3.      Budget

There are also questions flowing from Debtors' budget.

Though in some ways higher than a "typical" budget because of the

---

[24] The Court has not calculated whether the amount of lump sum payment proposed fully
accounts for the diversion of the funds to the 401(k) loans during the Plan's term.  It assumes the
parties have and, as noted below, will require Debtors' analysis to be provided.

MEMORANDUM OF DECISION - 18

separation of the parties, the submissions by Debtors in general reflect reasonably estimated expenses.[25]  This accords with the idea that Debtors, in order to manifest their good faith, are proposing to contribute the maximum amount reasonably available to them for the full 60 month duration of the Plan.[26]

Given the nature of the present living arrangements and the potential for change in those arrangements, and given the magnitude of expenses and the financial circumstances of Debtors, and in light of the good faith issue and Debtors' approach to that issue, the Court will require monthly financial reporting to be provided to the trustee for the duration of the Plan, and the same shall be available to the IRS and ISTC at their request.

**CONCLUSION**

A difficult question was presented to the Court, and it was ably tried and argued by both sides.  The Court concludes that Debtors should be allowed to address the questions remaining as outlined immediately above.  If Debtors can satisfactorily do so, it appears to the Court that the weight of the evidence and the totality of the circumstances would support a finding of good faith and that a plan

---

[25]  Indeed, in some ways, the expenses may be too conservative.  For example, given the distances traveled by Mr. Bowen, the nature of his vehicle, and the current cost of gas, the estimate for transportation expense appears short of the probable mark.

[26]  Mr. Bowen's choice to live in Wyoming, with his lengthy "commute" to work is a matter of concern.  But it is true the residence in Rock Springs is rent-free, and Mr. Bowen avoids a rental expense that would be incurred in leasing a place closer to his family and to Boise and its airport.  In a sense, this offsets the expense of commuting from the Wyoming residence to Salt Lake on some portion of the 8 to 10 days per month that Mr. Bowen is not flying.

MEMORANDUM OF DECISION - 19

could be confirmed with an appropriately crafted order.

To bring the matter to conclusion, the Court will enter an order requiring Debtors to file an amended plan addressing the issues identified above, as well as providing for the increased payments (from tax refunds and following cessation of child support payments) that Debtors discussed during the August hearing. Debtors may also file briefing addressing and explaining their amendments. Such submissions shall be made on or before October 11, 2005. The IRS shall have until October 26 within which to file any response. The trustee shall file amended findings and recommendations on Debtors' amended Plan by October 26.

Continued hearing on confirmation will be scheduled for November 1, 2005 on the Court's video calendar.[27] Notwithstanding that this hearing will be conducted by video, evidence may be presented. The parties will exchange among themselves and lodge with the Court any proposed exhibits not later than October 28. They will also identify witnesses by that date.

Alternatively, if after the amendments and submissions, the parties agree on a form of order for confirmation of the amended Plan, the Court will entertain the matter on the record and vacate the hearing, unless it independently determines the hearing is required.

---

[27] The parties may appear in Boise or Moscow.

MEMORANDUM OF DECISION - 20

DATED:  September 27, 2005



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 21